[Civ. No. 1101.   Third Appellate District.—August 13, 1913.]

L. P. LAIRD, Appellant, v. C. L. BOOTHE, Respondent.

ELECTIONS—IRREGULARITIES IN PROVIDING VOTING BOOTH AND GUARD-RAIL.—In holding an election a departure from the provisions of section 1203 of the Political Code, in not having a guard-rail protecting the election officers from other persons allowed in the room, and in not erecting the voting booth so as to be hidden from the view of those outside the guard-rail, does not warrant a disregard of the votes cast in the precinct, nothing prejudicial to the rights of anyone resulting from such irregularities.

ID.—ARRANGEMENT OF VOTING PLACE—SUBSTANTIAL COMPLIANCE WITH STATUTE.—Some degree of liberality of construction should be given the statute in dealing with small precincts in counties where it is not always practicable to conveniently arrange the voting places in strict conformity with the statute.

ID.—IRREGULARITIES—FAILURE STRICTLY TO COMPLY WITH LAW.—To upset an election because the election officers have failed to strictly comply with the law, where it appears that no harm has been done thereby, would be to encourage irregularities committed for the very purpose of invalidating elections.

APPEAL from a judgment of the Superior Court of Mariposa County.   J. J. Trabucco, Judge.

The facts are stated in the opinion of the court.

John A. Wall, and Henry Brickley, for Appellant.

F. W. Henderson, for Respondent.

CHIPMAN, P. J.—Appellant, who was the contestant, thus states the case:

"This is an election contest, the parties to the proceeding having both been candidates for the office of supervisor in supervisorial district No. 5, in the county of Mariposa, at the general election held on November 5, 1912.   This supervisorial district at the time of the election was composed of several election precincts, and, among others, the precinct of Wawona. The contention of the contestant at the hearing was that the votes cast in this precinct should have been rejected.   If this had been done, the result of the election would have been

changed, and the contestant would have been declared elected instead of the respondent. The judgment of the lower court, however, went in favor of the respondent, and from that judgment the contestant prosecutes this' appeal.'' He relies for a reversal upon the single proposition that: ''The election at Wawona precinct was accompanied by so many gross irregularities and so many flagrant instances of misconduct on the part of the board of election that it must be presumed that the election in said precinct was tainted with fraud, and that the entire vote cast thereat must be rejected.''

The findings and judgment were in favor of defendant, the contestee. Plaintiff appeals from the judgment.

The irregularities relied upon by appellant for a reversal of the judgment, as occurring at the Wawona precinct, are specified as follows:

1. Contrary to section 1203 of the Political Code, no booths were provided in which the electors should mark their ballots within the view of the election board, or the bystanders, but on the other hand, the voters were permitted to retire entirely without the view of such by-standers and election officers;

2. The election was not had at the place appointed by the board of supervisors, but at a place considerably distant therefrom;

3. The officers of the election failed to provide a guard to prevent the public from mingling with the election officers and afforded opportunity for tampering with the election paraphernalia.

The parties to the action were rival candidates for the office of supervisor district number five in the county of Mariposa, at the election held November 5, 1912. Defendant received two hundred and thirty-six votes and plaintiff two hundred and twenty-six votes and, upon a canvass duly made, defendant was declared elected and thereafter commissioned. The vote at Wawona precinct is alone called in question and contestant suggests that it should be entirely thrown out which, if done, would show that he had received the greater number of votes.

The evidence shows that the election in Wawona precinct was held in a small building known as the Bruce cottage situated about four hundred feet from and in plain sight of a large room known as the ''hall'' which had been designated

by the board of supervisors as the voting place. This hall had been previously used for that purpose as had also the Bruce cottage. The hall belonged to the Wawona Hotel Company and objection was made by the proprietor to its use on account of its being filled up with beds. He told the officers to clean out the Bruce cottage. It was also objected that the hall was a cold place and there was no means of heating it. The temperature on the day of election was below freezing point. The removal to the Bruce cottage was satisfactory to all the election officers and was more comfortable than the hall because it could be heated by a stove. The evidence was that no one was deprived of voting by reason of the change of the place of voting. The part of the Bruce cottage used for the polling place consisted of two rooms, one about fourteen feet by twenty feet, used by the board for its accommodation, designated as room 2, and the other about six feet by ten feet, designated as room 4. A door opened into this small room from the larger one and there was one window in it. A booth was erected inside of this small room, 4, with three sides to it but had no covering across its front. Walter Webling, one of the election officers, testified: "My idea in putting the booth in room 4 was to make it more convenient for the election officers and for the voters who came there to vote. An Indian and myself nailed up a piece of common green window shade on the lower half of the window in room 4. This shade kept out the light and shut off the view from the outside through the lower half of the window. I know this because I had the Indian go inside and I went outside to look at it. This was the day before the election. I could not see the Indian at all. This curtain remained up the day of the election and is there now. The booth frame was all right. I had a piece of awning over the side and top of the booth. There was no covering across the front of the booth. When a person would come up (to vote) he would sign the roster, get his ballot, go into the room where the booth was, and then vote. Sometimes the door into the room from where the election officers were sitting to the room where the booth was was closed and sometimes left open by the voter when he retired into the room to mark his ballot and only one person at a time was admitted into the room where the booth was."

C. A. Washburn, one of the election officers, testified as follows: "I noticed the window in the little room where the booth was placed, the lower part of the window was covered. It would shut out the view of any one standing outside. I am six feet one inch in height; after the election a few days before we came down I stood inside the room and Mr. Webling stood outside this window and I could not see Mr. Webling because the curtain was too high, the curtain was in the same position when I made the experiment with Mr. Webling as on election day. The booth was just a common skeleton booth with cloth on three sides; it had cloth on the south side; the cloth was down so far on that side that even though there was no curtain on the window itself a person marking his ballot in the booth would be cut off from view of a person standing outside and near the window. Only one person at a time was allowed in room 4, the booth room. I thought the small room was a good place for the voter, away from everyone else, and in view of the inclement weather it was better to have the booth in the smaller room than out in the large room where the men were allowed to go in out of the cold."

F. W. Schlagater, an election officer, testified as follows: "Regarding the closing of the door when a voter retired to room 4 (where the booth was) to mark his ballot, when the voter got into the room some one closed it and at the time I watched it nothing closed it, it naturally closed that way, the door was hung imperfect, it naturally would swing toward the jamb. Only one person at a time was allowed in the room where the booth was."

With regard to changing the place of voting the following testimony was given:

E. N. Baxter, a witness on behalf of defendant, testified as follows: "I was justice of the peace of the township in which Wawona precinct is at the time of the election in November of this year, when I knew of the change from the hall to this other cottage I did not attempt to discourage the change, from what I could see there was a necessity on account of the cold. On the morning of election the temperature was about thirty or thirty-two. Before the polls were opened in the morning. I called Mr. Murphy, he was at the hall, I was on the side of the cottage, I went out on the porch to see if I could see him at the hall or store, I saw him down there and I hollered to

him; from where I was standing at the cottage I could easily see the hall. Murphy came when I hollered.''

A. H. Bruce testified as follows: ''The polling place in Bruce cottage was in plain view of the hall and I should judge about four hundred feet or a little over one hundred yards distant.''

Walter Webling testified as follows: ''The hall is owned by the Wawona Hotel Company. It was not agreeable to the manager of the company to have the election in the hall. He told me to clean out the room in the Bruce cottage; his reason was that the hall was used for a store room in the winter. . . . So far as I know the removal of the polling place from the hall to the Bruce cottage was satisfactory to me and also to all the members of the election board there.''

C. A. Washburn testified as follows: ''John Washburn, the manager of the hotel company, did not want the election held at the hall. The hall was not a convenient place; it was full of beds, a store room for winter time and it was very cold and there was no stove. . . . I did not hear nor do I know of any one not being able to vote on account of the change of polling place from the hall to Bruce cottage. I have served on election boards at Wawona precinct prior to this election. I have voted at elections held in Bruce cottage.''

F. W. Schlagater testified as follows: ''The polling place was changed because there was stuff stored in the hall, there was not much room, then it was cold and no stove was there and Mr. Washburn said we would have to use the bunkhouse (the Bruce cottage), the principal reason for the change was on account of the cold. I do not know of any one not being able to vote on account of the change.''

C. H. Murphy testified as follows: ''The removal of the polling place from the hall to the Bruce cottage was satisfactory to me. I did not hear of any one not voting or who was not able to vote on account of the change.''

The explanation with respect to the guard-rail was made as follows:

A. H. Bruce testified as follows: ''In the morning there were some outsiders allowed to remain in the place where the election officers were; this was not the practice in the afternoon; the object of allowing these men to come into the room was on account of the cold weather. The stove was back of

the election officers about five or six feet; I did not observe anything out of the way; these people did not interfere with the election officers, there was plenty of room to allow the officers to perform their duties. I did not see or hear any interference in any way. . . . Q. Did these men who were in the room warming up in the morning interfere in any way with the individual voter, who had retired to vote in the polling place? A. Not that I could see, no. Nothing was said by any of these men in the room to the voters as to who he wanted to vote for. I believe seven or eight women voted that day; about half voted in the morning; some of the women with little babies were allowed to go into the room by the fire and warm themselves.''

F. W. Schlagater testified as follows: ''There was no disturbance or noise of any kind or interference with the election officers or voters in any way that I know of. I was there all day except at meal time, twenty-five or thirty minutes. In the morning first a load came down from Sugar Pine Mills and it was a very cold morning and they came in (where the election officers were). We had a good fire in there and they all came in and sat around the fire until they got through voting and then they went home. . . . In the afternoon we did not allow anybody into the room about the election officers except Mr. Bruce's wife, mother and child, we allowed them to come in for their comfort.''

Walter Webling testified as follows: ''In the morning of the election we allowed persons to enter the room where we sat. It was a pretty cold morning and we allowed them to stay as a matter of comfort. . . . After the weather moderated we took a table and put it across the door ('A'); when a person would come up he would sign the roster, get his ballot, go into room 4, go into the booth and then vote and no one was admitted into the room (in the afternoon) after that except three ladies who were allowed to come in as a matter of courtesy and comfort and they remained long enough to vote and then departed.''

E. N. Baxter testified as follows: ''Q. Please go on and state the condition of the room 2 (where the officers sat) in reference to guards and railings put up to keep the public out. A. There were two or three stage loads of men from the lumber camp, it was a little cold and there was a fire in

the stove and they all came into this room number 2 and they really made a great deal of noise in there and I said the next time the next bunch that comes down, that I did not think it was right for them all to be standing around in there and so when the next bunch came I took the table and put it right in front of the door (marked 'A') and then put the roster on the table and let them all sign it and they all signed it and then I let one man in at a time. I think two of the election board were out to lunch. I let one man in at a time and he came and got his ballot and went into the room (No. 4) and then I let him out and let one more in and he went on and did the same thing and I put this little table with the roster, that the roster was on, right in front of the door, so they could not get in. . . . I put the table in front of the door and put the roster on there and had all of them, all sign it, five or six, and then had each one's name; I took his name and then moved the table away and let him in and the man that had already voted he went out.''

The foregoing fairly presents what in fact took place. There is some conflict with regard to the window covering in room 4 and the possibility of communicating from the outside with the voter while in room 4. But the trial court resolved the conflict satisfactorily, in our opinion. After setting forth in its findings the reason for changing the place of voting as given by the witnesses, the court found:

''8. It is true that the polling place was changed with the unanimous consent of all of the officers of election from said hall to a building in plain view of said hall and within 400 feet thereof in said precinct; that Wawona is and was on said day a village with a population not to exceed 40 people.

''9. It is true that one of the officers of election of said Wawona precinct on said election day was the duly elected, qualified and acting justice of the peace of township No. 5 in said county of Mariposa, the township in which said Wawona precinct is situated; that said justice of the peace did with the rest of the board of election consent thereto and order the changing of the polling place so as aforesaid.

''It is not true that plaintiff or any one else suffered any injury whatever or loss of votes whatsoever which plaintiff would otherwise have received had the election polling place not been changed.''

With respect to the booth the court found as follows:

"10. It is not true that the board of election of said Wawona precinct did not provide a booth to which the voters could retire and there mark their ballots; it is true that a suitable booth was provided in said precinct at the place where said voters voted, where the voters could and did retire and mark their ballots.

"It is true that the booth provided was in a room separate from the one in which were the election officers but it joined said room and connected with the room in which were said officers by a door which was sometimes partly closed and often closed; that only one person was admitted at a time in the room where said booth was; that the booth was in a position in said room where it could be and was seen by the election officers in the adjoining room, when the door was open.

"11. It is not true that the voters at said election in said precinct retired to the room in which said booth was and closed the door between the two rooms hereinbefore mentioned or that the door remained closed during any of the times that a voter was in the booth preparing his ballot, except as stated above.

"12. It is true that in the room where said booth was and to which the voters retired for the preparation of and did prepare their ballots was one window on the south side of the room.

"It is not true that while the voters in said precinct were in said room preparing their ballots any one on the outside could see or look through said window or see what the voter was doing in said room.

"It is true that across the window in the room where the booth was, in said precinct, for the lower half thereof a curtain was stretched on said election day which prevented persons from seeing into said room preparing his ballot.

"13. It is not true that the voters in said precinct on said day in the preparation of their ballots were not screened from the observation of others or were not under the observation and protection of the board of election of said precinct."

The findings as to the guard-rails were equally well supported by the evidence and are as follows:

"14. It is true that up to and about noon of election day there was not provided at said polling place a guard, railing

or separate or inclosed part of the room wherein the election was held, for the protection of the voters, the ballots or election machinery or for the purpose of holding the election officers separate and away from the general public while not voting during the time said officers were conducting said election.

"It is true that about noon of election day and thereafter a table was placed across the door opening from the veranda into the room where said election officers were which was used on said day as a guard, railing and protection to the election officers in said polling place and to the voters in the preparation and casting of their ballots and that said table was moved to allow the voter to enter in and depart from said polling place.

"It is not true that the election at said precinct was conducted in two separate rooms except as hereinbefore stated.

"15. It is not true that during any time whatsoever on said election day at said polling place the general public rambled in or out or lounged about in company with the election officers except that during a portion of said day while the weather was extremely cold the officers of said election, while the election was in progress did for a few minutes allow a few persons, including some small children, to assemble in and remain in the same room with the election officers for their comfort while at the polls or for the purpose of recovering from the effects of a cold ride for a considerable distance to the polling place; that said persons, other than the children mentioned, were electors and remained in said room for but a short time; that the children accompanied said electors.

"It is not true that any of the voters at said election in said precinct were in the immediate presence or under the observation of any outsider in the room whatsoever when the voter received his ballot for the purpose of voting or when he returned after the ballot was prepared to cast his ballot except as hereinbefore stated; that during the time said outsiders were in said room they occupied a portion of the room where they could not see the voter in the booth preparing his ballot.

"It is not true that said election board allowed on said day any one who was incapacitated from voting intelligently or independently through the excessive use of intoxicating liquor, to vote."

The court also found as follows:

"17. It is true that all the irregularities in the holding and conducting of said election by said election board were the result of ignorance or inadventure or necessity and were not of any fraudulent design or for the purpose of doing wrong.

"It is not true that any of the irregularities of said board of election affected in any way the result of said election or deprived either of the parties to this action of any vote or votes or misled any person whatsoever or that any voter was prevented or lost his vote by the removal of said polling place so as aforesaid or by any other act of said election board."

It seemed but simple justice to the election officers and the trial court to give thus somewhat fully the evidence and findings.

The alleged violation of section 1203 of the Political Code consisted, first, in not having a guard-rail protecting the election officers from persons allowed in the room used by such officers, and, second, in not erecting the voting booth so as not to be "hidden from the view of those just outside of the guard-rail"—i. e., a guard-rail "so constructed and placed that only such persons as are inside said rail can approach within six feet of the ballot-boxes and of such booths or compartments. The arrangement shall be such that neither the ballot-boxes nor the box-booths or compartments shall be hidden from the view of those just outside the said guard-rail." (Pol. Code, sec. 1203.)

It was an irregularity, not to be commended, to place the voting booth in a separate room which when the door was closed shut off the view of the booth from both the by-standers and the officers. But it appeared that only one voter was allowed to enter this room at the same time and this voter was shielded from interference or view from the outside and generally the door was open allowing full view of the booth.

The failure to erect a guard-rail or a substitute for it in the forenoon and allowing voters to enter the room in which the officers sat is, we think, explained in a way to relieve the officers from culpability, and the evidence is undisputed that the proper conduct of the election was not in any wise interfered with. Some degree of liberality of construction should be given the statute in dealing with these small precincts in counties where it is not always practicable to conveniently

arrange the voting places in strict conformity with the statute. What was said in *Hayes* v. *Kirkwood,* 136 Cal. 396, 402, [69 Pac. 32], seems applicable here: "But in the case at. bar it sufficiently appears that nothing prejudicial to the rights of any one resulted from the irregularities and omissions complained of; there is nothing to warrant the court in defeating the will of innocent voters. It must be remembered that neither the voters nor those voted for have any control over the officers of election and to upset an election because such officers have failed to strictly comply with the law where it appears that no harm was done thereby, would be to encourage irregularities committed for the very purpose of invalidating elections."

We cannot bring ourselves to believe that it would be just to the voters of Wawona precinct to wholly disregard their votes because of the irregularities shown.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 11, 1913.